# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

RUTH ANDERSEN,
MYRON ANDERSEN, and
AF FUNDS MONTANA LLC,

          Plaintiffs,

          v.                              CAUSE NO. 3:16CV830-PPS

THOR MOTOR COACH, INC.,

          Defendant.

## OPINION AND ORDER

AF Funds Montana LLC bought a new 2016 Tuscany 44MT recreational vehicle from Thor Motor Coach.[1]  This lawsuit by the LLC, its member Myron Andersen, and his wife Ruth, brings a litany of alleged defects and failed repairs in support of claims for breach of warranty and breach of unfair and deceptive trade practices statutes.  Thor now seeks summary judgment, and has also filed a separate motion to strike portions of Myron Andersen's affidavit.

## Undisputed Facts

Myron Andersen founded a lumber and building material company called Builders Warehouse in 1977, and served as its president until his retirement in January 2016.  [DE 25-3 at 9, 13.]  By the time of Myron's retirement, Builders Warehouse had

---

[1] The complaint in this case names "AF Funds Montana LLC" as a party-plaintiff, but the vehicle's purchase agreement and title are in the name of AF Funds LLC.  No motion to correct the apparent misidentification has yet been filed.

reached annual sales in the $65 million range.  [*Id.* at 10.]  The complaint identifies the corporate plaintiff as "AF Funds Montana LLC" but the Operating Agreement identifies the Montana Limited Liability Company as "AF Funds LLC" and the two member-owners as Myron Andersen and Stacy Bovina, who is Myron's daughter.  [DE 25-4 at 1; 25-3 at 17.]  Ruth Andersen is not a member of AF Funds.  [DE 25-3 at 20.]  Plaintiffs contend that Stacy is listed in the Operating Agreement only "as a contact, but she is not a member of the LLC, she does not hold any interest in the LLC, and she did not sign the Operating Agreement for the LLC."  [DE 34-1 at 3.] Besides the Tuscany RV that is the subject of this lawsuit, AF Funds also owns a Class C Coachmen motorhome, and has also owned a BMV vehicle.  [DE 25-3 at 21.]

The Tuscany RV was purchased for $289,988 on January 22, 2016 from a dealership in New Braunfels, Texas called Camping World RV Supercenter, which is owned by Southwest RV Centers, LLC.  [DE 25-5 at 1; DE 25-3 at 29.] The RV was titled in the name of AF Funds LLC and has only ever been registered in the name of AF Funds in the state of Montana.  [DE 25-3 at 25.]  Evidently, by putting the RV in a corporate name and registering it in Montana, Andersen avoided a hefty sales tax.  [*Id.*] AF Funds took out a loan to buy the RV, and Myron Andersen personally guaranteed the loan. [DE 25-3 at 23.]

At the time of the RV purchase, Myron Andersen signed a Thor Motor Coach form called "Registration and Acknowledgement of Receipt of Warranty and Product Information."  [DE 25-6.]  That document contained this language:  "You, the purchaser, should not submit this form until (1) you have received and reviewed the Limited

2

Warranty and owner's manual...." [*Id.*] The form also contains the purchaser's acknowledgement that "I received and read the final stage manufacturer's 1 page Limited Warranty, published within the Owner's Manual, and the Chassis Limited Warranty, both of which were made available to me, before I purchased the vehicle and agreed to the terms and conditions therein...." [*Id.*]

As I noted above, Andersen chose to put the RV in a business name for tax purposes, but that decision had a substantial effect on the terms of the warranty that Thor provided. Here's what The Limited Warranty states:

> If...you register your new motorhome in a business name or use your motorhome for any commercial or business purposes other than for rental purposes, the limited warranty ends 90 days after you first take delivery of your motorhome **OR** after the odometer reaches 5,000 miles, whichever occurs first. If you register your new motorhome in a business name or use your motorhome for any commercial or business purpose, TMC disclaims any implied warranty of merchantability that may arise by operation of law.

[DE 25-7.]  Because the Tuscany RV was taken from the dealer's lot on January 28, 2016, and was registered in the business name of AF Funds LLC, Thor's position is that the Limited Warranty ended on April 27, 2016.  [DE 34-15 at 1; DE 25-3 at 44, 25; DE 25-1 at 8 .] Myron testified in his deposition that, at the time of the purchase, he was unaware that "some manufacturers excluded from coverage any RV owned in the name of a commercial or business enterprise."  [DE 25-3 at 37.]  As for the manufacturer's warranty on the Tuscany RV, Myron testified that he and the sales personnel at Camping World "continued to talk about a one-year warranty with a five-year extended-warranty option."  [*Id.* at 37-38.]

After taking possession of the Tuscany on January 28, 2016, Myron did not initially review the owner's manual that he was told could be found in a box in the vehicle, but testified that he discovered, the night before his deposition, that the pages of the manual that included the one-page warranty had been torn out.  [*Id*. at 38-39.] Myron claims that he was not given a copy of the warranty prior to purchase.  [*Id*. at 39.]  There is no evidence that Myron was given or shown or offered a copy of the warranty prior to execution of the purchase documents including the Acknowledgement and Purchase Agreement on January 22.  Instead, Myron testified that he relied upon the representations of the salesman that the RV came with bumper-to-bumper warranty coverage for the first year of ownership.  [*Id*. at 40.]

Thor's Limited Warranty expressly disclaims warranty coverage for a number of items, including "accessories and equipment added or changed after the motorhome leaves the factory" and "appliances and components covered by their own manufacturer's warranty."  [DE 25-7.]  Items listed in this second category include the RV's stove, stereo and radio.  [*Id*.]  The warranty further provides that "[a]ny performance of repairs after the warranty coverage ends OR any performance of repairs to those portions of your motorhome excluded from coverage shall be considered '*good will*' repairs."  [*Id*.]

The express warranty also contains another provision intended to limit implied warranties.  This language is highlighted by its appearance in all capital letters and by the use of blue text:

LIMITATION AND DISCLAIMER OF IMPLIED WARRANTIES:  THE
DURATION OF THE IMPLIED WARRANTY OF MERCHANTABILITY,
WHICH MAY ARISE BY OPERATION OF STATE LAW, IS LIMITED TO THE
DURATION OF THE LIMITED WARRANTY AND IS LIMITED IN SCOPE OF
COVERAGE TO THOSE PORTIONS OF YOUR MOTORHOME COVERED BY
THIS LIMITED WARRANTY.  THERE ARE NO EXPRESS WARRANTIES OR
ANY IMPLIED WARRANTIES OF MERCHANTABILITY ON THOSE
PORTIONS OF THE MOTORHOME EXCLUDED FROM COVERAGE.

[DE 25-7.]

The Purchase Agreement echoes these limitations.  Paragraph 10 is captioned

"DISCLAIMER OF WARRANTIES AND LIMITATIONS/EXCLUSION OF

REMEDIES." That paragraph is highlighted by the use of a double-bordered box

surrounding the text, and includes this language in all capital letters:

BUYER(S) UNDERSTAND AND AGREE THAT THE EXPRESS TERMS OF ANY
MANUFACTURERS WRITTEN WARRANTY, TO THE EXTENT ANY EXIST
AND APPLY TO THE UNIT, CONTAIN AND CONSTITUTE BUYER(S)'
EXCLUSIVE AND SOLE REMEDY FOR ANY PROBLEMS OR DEFEECTS THE
UNIT MIGHT CONTAIN.

[DE 25-5 at 2.]

The Limited Warranty, the Acknowledgement, and the Purchase Agreement all

make it abundantly clear that the dealer -- in this case, RV World -- does not speak for

the manufacturer on the subject of warranty coverage for the RV.   The Limited

Warranty provides that:

There is no warranty of any nature made by [Thor] beyond that contained in this
Limited Warranty.  No person has authority to enlarge, amend or modify this
Limited Warranty.  The dealer is NOT Thor Motor Coach's agent.  TMC is not
responsible for any undertaking, representation or warranty made by any dealer
or others beyond those expressly set forth within this Limited Warranty.

[DE 25-7.]  The Acknowledgment signed by Myron Andersen contains this language:  "I also understand that the selling dealer is not an agent for the final stage manufacturer but is an independent company with no authority to make any representation or promise for the final stage manufacturer."  [DE 25-6.]

The Purchase Agreement contains terms on this issue in several places, including: "Buyer(s) understand and acknowledge that Dealer is a separate and distinct entity from, and not the principal or agent or (sic) any manufacturer(s) of the Unit." [DE 25-5 at 1.]  Paragraph 7 of the Agreement is captioned "DEALER NOT AGENT OF MANUFACTURER" and begins with the sentence: "Dealer is in no respect the agent of the manufacturer."  [*Id*. at 2.]  The text of paragraph 12, "Non-Dealer Warrant(s) (if applicable)," includes:

> Buyer(s) acknowledge that Dealer is not an agent of the manufacturer and that Dealer has not represented or misrepresented the terms of any applicable manufacturer(s) written warranty(s), because either Buyer(s) have read to his/their satisfaction the actual terms of any such written instruments, which expressly state the coverage, application period, conditions, and exclusions or Buyer(s) have voluntarily chosen not to read such warranty(s).

[DE 25-5 at 2.]

Here's a chronology of the undisputed facts concerning the RV's history of service issues and attempts at repair.  When Myron Andersen arrived to pick up the RV on January 28, 2016, he waited while Camping World finished installing some "add-ons" to the RV, including DirecTV receivers.  [DE 25-3 at 46.]  Myron was told that Sirius and DirecTV would have to be contacted to connect those services, and that although the RV's GPS was not yet working, it could be expected to "come on."  [*Id*. at

47.]  Myron drove the RV from Camping World in New Braunfels, Texas to a location south of Austin and spent two days there.  [*Id.* at 48.]  Myron contacted either "Thor warranty people" or the Camping World dealership about the issues with the information center console, and was told that updated software was needed for the information center and GPS.  [*Id.* at 48-49.]

Work orders issued by dealer service departments indicate that during the 90-day period from January 28 to April 27, 2016, the RV was brought in for service twice. From Texas, Myron drove the RV to Destin, Florida to visit friends and stay in the RV for 30 days.  [DE 25-3 at 51.]  While there, Myron called a Florida Camping World dealership with a list of issues, some of which he was told could not be repaired during the Andersens' intended stay.  [*Id.* at 52-53.]  Leaks associated with the RV's slide-outs were among those problems that couldn't be quickly repaired, as was a problem with the cooktop's fit into the kitchen countertop.  [*Id.* at 53-54, 55-56.]  Items that were addressed at Camping World in Florida in early March included repairs to a broken shelf, the half-bath toilet, loose carpet trim, the shower doors, and the arm of the driver's seat.  [*Id.* at 54.]  The dealer could not fix the GPS, or assist with the RV's connection to DirecTV.  [*Id.* at 54-55.]  Those two issues, as well as the leaky slide-outs and countertop issue, remained unresolved by Camping World in Florida.  [*Id.* at 56.]

Later in March 2016, the Tuscany was taken to a Camping World in Council Bluffs, Iowa, the closest Thor dealer to the Andersens' home in Nebraska.  [*Id.* at 58.] The associated work orders disclose ten issues itemized for repair:  the slide-outs, GPS, rangetop, Sirius radio, ceiling fan blades, breaker panel cover, floor console

compartment between driver and front passenger seats, weather stripping on main slide-out, kitchen faucet sprayer, and refrigerator. [DE 25-8 at 2-3.] The RV remained at the Council Bluffs Camping World until May 16, 2016. All ten issues were diagnosed and addressed but not all to completion. [DE 25-8 at 2-3.] A new radio console was ordered but not yet received at the time the RV was picked up. [DE 25-8 at 2-3; DE 25-3 at 111.] Installation of the new console was hoped to address the problems with the Sirius radio, GPS, and DirecTV. Otherwise, Myron testified that the dealers told them they would have to contact Sirius and DirecTV for assistance. [*Id.* at 47.] Although Myron testified that his wife Ruth spent hours trying to accomplish that, without success, he later testified that he (or they) had never called the radio or information center manufacturer. [DE 25-3 at 47, 49.]

The other remaining issue was the fit of the cooktop. [*Id.* at 62-63.] The range top did not sit flush with the countertop, and there was an issue with its drawer, both of which Myron had fixed by a local appliance repair service after taking the RV home to Nebraska. [DE 25-3 at 63.] The problems turned out not to result from the cooktop being warped, and after these fixes, there were no further complaints about the cooktop. [DE 25-3 at 63.] Back home in Nebraska on May 17, the Andersens set about cleaning the RV in preparation for a trip to Branson, Missouri. [DE 25-3 at 67.] When they opened a storage compartment, they were surprised to learn that a mother raccoon and four baby raccoons were nesting inside. [*Id.*]

On May 19, Myron sent an email to Mike Burden, the service manager of the Council Bluffs Camping World, setting out three issues for which additional repair or

replacement was being sought.  [DE 25-9 at 1-2.]  First, Andersen inquired about the new radio console on order, and expressed his hope that it would solve both the radio and GPS problems.  [*Id*. at 1.]  Second, the letter inquired whether a new glass cooktop had been ordered (because at that time Myron believed that the original cooktop was warped).  [*Id*.]  Finally, Andersen described the damage inflicted by the raccoons that had entered the RV while at Council Bluffs, including holes in the carpeting and damage to weather stripping.  [*Id*.] Damage to water lines and wiring were dealt with at a local dealer to enable the trip to Branson in the RV.  [DE 25-3 at 71.]

Mike Burden responded to the email by phone, and during that conversation suggested that Myron contact his insurance company concerning the raccoon damage, but Andersen did not do so because he thought Camping World was responsible.  [DE 25-3 at 66, 68-69.]  Myron never contacted the manufacturer of the information center concerning the problems with the Sirius radio and GPS. [DE 25-3 at 49.]

After the trip to Branson, more repairs and service were needed, and Myron took the RV to a Camping World in Longmont, Colorado on June 16, 2016.  [DE 25-3 at 70.] The work order lists 21 complaints.  [DE 25-14 at 1-6.] The RV remained in Longmont for service until September 30, 2016.  [DE 25-3 at 77.]  Once the Tuscany was returned to Nebraska, Myron entered the RV and found weather stripping for one of the slide-outs lying on the floor inside.  [DE 25-3 at 81.]  He testified that even after several months in for repair with Camping World in Longmont, the two front slide-outs still didn't work properly.  [DE 25-3 at 81-82.]  No further service has been sought for the Tuscany.  [DE 25-3 at 82-83.]

## Summary Judgment Standard

A motion for summary judgment has been described as the "put up or shut up" juncture in a lawsuit. *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). To defeat summary judgment by establishing a genuine dispute of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986).

Instead, "summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial," which means "sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in [its] favor as to any issue for which it bears the burden of proof." *Grant*, 870 F.3d at 568. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine." *Skodras v. Gulf Stream Coach, Inc.*, 2010 WL 145370, at *1 (N.D.Ind. Jan. 8, 2010) (Lee, J.), citing Fed.R.Civ.P. 56(c), (e).

## Whether These Plaintiffs Have Claims

The first issue to consider is whether the correct plaintiffs have brought this lawsuit. Thor makes much of this predicate issue so I will address it first. The parties

apply Indiana law to the question whether Myron and Ruth can assert a breach of warranty claim. [DE 25-1 at 25-26; DE 34 at 35-36.] Indiana law governing warranties defines a buyer as "a person who buys or contracts to buy goods." I.C. 26-1-2-103. Thor argues, persuasively, that because neither Myron nor Ruth bought or contracted to buy the RV, they are not "buyers" under the Indiana Commercial Code and can't bring a claim for breach of warranty. [DE 25-1 at 26.]

In opposition the Andersens cite Indiana Code 26-1-2-318, which provides a limited third-party beneficiary status for invocation of warranties: "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer…if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." I agree with Thor that as a matter of law this provision does not give the Andersens third-party beneficiary status for two reasons. First, the Andersens cannot reasonably be said to be "in the family or household" of the business entity that was the buyer of the LLC, because an LLC has no "family" or "household." *Davidson v. John Deere & Co.*, 644 F.Supp. 707, 713 (N.D.Ind. 1986) (Miller, J.) (under statute, employee is not third-party beneficiary of warranty to his corporate employer, the buyer of a skid-loader).

Second, the statute applies only to an "injur[y] in person," meaning personal injuries rather than property damage or economic loss such as claimed in this case. *Hyundai Motor America, Inc. v. Goodin*, 822 N.E.2d 947, 955-56 (Ind. 2005). Myron Andersen and Ruth Andersen fail to demonstrate that they can assert a breach of warranty claim against Thor.

Now seems a good time to point out that although the first count of the complaint refers to "Breach of Warranties and/or Breach of Contract," the plaintiffs have never identified any contract in play other than warranties on the Tuscany RV. Thor is entitled to summary judgment against Myron Andersen and Ruth Andersen on their "First Claim" for breach of warranties and/or breach of contract.

The complaint's "Second Claim" is brought under the Magnuson-Moss Warranty Act. The MMWA uses the term "consumer" and defines it as:

> a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).

15 U.S.C. §2301(3). Thor argues that the Andersens don't meet any of the three options within this definition, because they are not buyers or transferees of the RV, and are not otherwise entitled to invoke the warranty by its terms or via any state law. [DE 25-1 at 26-27.]

To the extent the Andersens respond by relying on third-party beneficiary status under I.C. 26-1-2-318, I have already rejected that argument. The Andersens contend that that they are "consumers" under the MMWA because the RV was purchased for their personal use, because Myron is the sole member of AF Funds LLC, and because he and Ruth are married and live at the same address. [DE 34 at 36.] These circumstances, even if true, are not on point. They are facts unrelated to the statutory definition and do not yield the conclusion that the Andersens meet either the Indiana third-party

beneficiary provision or the MMWA definition. Thor is entitled to summary judgment against Myron and Ruth Andersen on their "Second Claim" under the Magnuson-Moss Warranty Act.

Thor argues that AF Funds LLC is not shown to be authorized to bring this lawsuit by its manager, Business Tech Corporate Services, which under Montana law would have the right to manage and conduct the company's business. [DE 25-1 at 27.] The Operating Agreement of AF Funds LLC identifies Business Tech as both the LLC's registered agent and as the LLC's manager. [DE 25-4 at ¶4, ¶8(b).] Article III of the Agreement further provides that "The Manager shall conduct the business of the LLC only as directed by the member." [*Id*. at ¶8(a).] The membership of the LLC is addressed in ¶7, which contains some contradictory indications. The section is captioned "Single Member" but lists two names under the "Member (Owner)" column – Myron Andersen and Stacy Bovina. *Id*. Across from Myron's name the second column indicates "100% Ownership Interest," with no separate indication of any percentage interest held by Stacy. *Id*. The introduction to the Operating Agreement says it "is entered into by the following persons," listing both Myron and Stacy. [*Id*. at 1.] The copy of the agreement submitted to the court in this case bears the signature of Myron only, with a signature line labeled "Stacy Bovina, Member" left blank. [*Id*. at 6.]

Thor interprets the agreement to show that Myron and Stacy "jointly own 100% of the interest of the LLC." [DE 38 at 24.] Plaintiffs contend that Myron "is the sole member of the LLC holding 100% interest in the LLC." [DE 34 at 38; see also DE 34-1 at 3.] Their contention is that the agreement "lists Stacy Bovina as a contact, but she is not

a member of the LLC, she does not hold any interest in the LLC, and she did not sign the Operating Agreement for the LLC."  [DE 34-1 at 3.]

The agreement contains three references to Stacy Bovina as a member, and at times uses the plural "Members."  On the other hand, the agreement also refers to a "single member" and uses the singular term repeatedly, arguably shows Myron as holding a 100% interest and Stacy none, and is signed only by Myron.  For these reasons, the language of the Operating Agreement is ambiguous as to the membership of the LLC.  Neither party has offered "evidence of the circumstances under which the agreement was made" to be "considered to determine the intent of the parties."  *Kapor v. RJC Investment, Inc.*, 434 P.3d 869, 877 (Mont. 2019).   In making its argument, Thor has not adequately addressed this ambiguity and its impact.

In opposition, the LLC points out that the Operating Agreement specifies "Member Only Powers" in ¶9, after noting in ¶8 that the delegation of management of the LLC to the manager is "subject to the limitations set out in this agreement."  [DE 25-4 at 2.] The "Member Only Powers" include that "a majority of the members may incur debts, expend funds or otherwise obligate the LLC."  [*Id.*]  These powers may encompass filing suit on behalf of the LLC.  Thor cites Montana Code §35-8-301(2)(a): "If the articles of organization provide that management of the limited liability company is vested in a manager…a member, acting solely in the capacity as a member, may not be an agent of the limited liability company."  But Thor fails to account for the impact of the Operating Agreement's language recognizing limits to the delegation of authority to the manager and authorizing certain actions by a majority of the members.

Furthermore, Article VI of the agreement provides that "[a]ny person who is or was a Member…and who is…a party to any civil…action because of his/her participation in or with the LLC and who acted in good faith and in a manner which he/she reasonably believed to be in, or not opposed to, the best interests of the LLC maybe indemnified and held harmless by the LLC."  [*Id*. at ¶19.]  Might this language inform a determination whether by authorizing the litigation, Myron's acted on behalf of the LLC?  This open-ended discussion supports two conclusions.  First, as the moving party Thor has not treated this argument in sufficient depth and detail to support a determination as a matter of law that the action on behalf of the LLC is unauthorized.  Second, from the ambiguous Operating Agreement alone, it is not conclusively established that the action on behalf of the LLC was unauthorized if initiated solely by Myron.  Thor's challenge to the authorization for claims by the LLC is rejected.

## What Warranty Terms Are In Effect

The next issue is to be addressed is what warranties apply to the purchase of the Tuscany RV.  Thor's motion for summary judgment contends that the express warranty by its terms was limited to 90 days because the purchaser was a business entity.  Thor also argues that the express warranty limited any implied warranties to the same scope and duration as the express warranty.  The text of the Limited Warranty is clear in its intention to create such limitations.  But did it succeed in legally doing so?

The parties agree that Indiana law governs the warranty claims. [DE 34 at 7: DE 25-1 at 25, n. 1.] Indiana law creates an implied warranty of merchantability, but permits some exclusion or modification of an implied warranty. I.C. 26-1-2-314(1) provides that "[u]nless excluded or modified (IC 26-1-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Subsection (2) of the cross-referenced statute, I.C. 26-1-2-316, conditions the exclusion or modification of the implied warranty of merchantability on explicit reference to "merchantability" and the use of "conspicuous" language. The Limited Warranty's "LIMITATION AND DISCLAIMER OF IMPLIED WARRANTIES" in this case contains express and conspicuous language highlighting that the warranty of merchantability otherwise implied under state law is limited in both duration and scope in the same manner as the express Limited Warranty.[2] Under Indiana law, then, Thor appears to have succeeded in reducing the implied warranty of merchantability to be coterminous with the terms of the express warranty. But not so fast. The federal law on which the Second Claim is based, the Magnuson-Moss Warranty Act, puts further restrictions on attempts to disclaim or limit the implied warranty of merchantability.

The MMWA provides a federal claim for "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract."

---

[2] The earlier provision that Thor "disclaims any implied warranty of merchantability" if a new motorhome is registered in a business name does not appear in bold or capital letters and is not conspicuous within the meaning of the term's definition in I.C. 26-1-1-201(10).

15 U.S.C. §2310(d)(1).  State law warranty claims may be brought alongside MMWA claims:  "for all practical purposes, the MMWA operates as a gloss on…state law breach of warranty claims."  *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781 (7th Cir. 2011). "In addition to allowing consumers to bring federal claims premised on written warranties, the MMWA allows consumers to bring claims for violations of implied warranties, which the MMWA defines as a warranty under state law."  *Id.* at 783.

The MMWA "limits the extent to which manufacturers who give express warranties may disclaim or modify implied warranties, but looks to state law as the source of any express or implied warranty."  *Hyundai Motor America, Inc. v. Goodin*, 822 N.E.2d 947, 951 (Ind. 2005). Limited warranties are the subject of 15 U.S.C. §2308. Section 2308(a) provides that "[n]o supplier may disclaim or modify (except as provided in subsection (b)) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product…"  The exception in §2308(b) allows limitation *of the duration* of implied warranties "to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty."  Not only does the MMWA disallow disclaimers or modifications of implied warranties except as to the issue of duration, it also invalidates any non-compliant attempts at disclaimers or modifications even as a matter of state law.  Section 2308(c) provides that a "disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this chapter *and State law.*" (Emphasis added.)

So Thor's attempt to limit the *scope of coverage* of the implied warranty of merchantability is ineffective in view of the MMWA. This conclusion appears clearly supported by the language of §2308, but the issue has not been identified or argued by plaintiffs here. Nonetheless, faced with the statutory language, I apply this analysis which, as will be seen, has a significant impact on the outcome of the present motion. Thor's attempt to limit the *duration* of any implied warranty to the same period as its express warranty meets the MMWA's requirement of clarity and prominent inclusion in the written warranty. That leaves the question of conscionability of the 90-day limitation, which is an issue of law for the court on which plaintiffs bear the burden of proof. *Mathews v. REV Recreation Group, Inc.*, 2018 WL 1586254, at *18 (N.D.Ind. April 2, 2018) (Lee, J.)

Under Indiana law, "an unconscionable contract is one that 'no sensible man not under delusion, duress or in distress would make, and [that] no honest and fair man would accept.'" *Jackson v. Bank of America Corp.*, 711 F.3d 788, 792 (7th Cir. 2013), quoting *Weaver v. Am. Oil Co.*, 276 N.E.2d 144, 146 (1971). The standard is hard to meet, and "courts do not regularly accept it as an argument." *Jackson*, 711 F.3d at 792. A contract can be "substantively unconscionable, procedurally unconscionable, or both." *Id.*, citing *DiMizio v. Romo*, 756 N.E.2d 1018, 1023 (Ind.Ct.App. 2001). Substantive unconscionability occurs when the terms of a contract are "oppressively one-sided and harsh," a circumstance particularly likely where the consumer "is not in a position to shop around for better terms." *DiMizio*, 756 N.E.2d at 1023; *Terry v. Ind. State Univ.*, 666 N.E.2d 87, 93 (Ind.Ct.App. 1996).

Let's be honest about it, a warranty of only 90 days on a $300,000 purchase is awfully stingy. But I can't say as a matter of law that no sensible person would accept it, particularly if immediate and extensive use of the RV was contemplated, as appears to have been here. With such plans, a buyer could reasonably expect manufacturer defects to manifest themselves within 90 days after purchase. In the RV market, consumers have plenty of choice and the record doesn't support any conclusion that the Andersens or AF Funds were not free to shop around for better warranty terms.

Neither does the record support a finding of procedural unconscionability, which arises from "'irregularities in the bargaining process or from characteristics peculiar to one of the parties,'" such as physical or mental incapacity. Myron Andersen is a sophisticated consumer; he is the highly successful founder and operator of his own business with multi-million dollar annual sales. No allegation of unequal bargaining power is made, but in any event would not, by itself, make the contract process unconscionable. *Jackson*, 711 F.3d at 793.

A number of courts have rejected arguments like those made here that unconscionability is shown by a failure to make a vehicle's warranty available to the plaintiffs at the time the sale contract was signed, or by the buyer's unfamiliarity with the warranty's terms defeating a meeting of the minds. *See, e.g., Mathews*, 2018 WL 1586254, at *13; *Dixon v. Monaco Coach Corp.*, 2009 WL 187837, *10 (N.D.Ind. Jan. 27, 2009); *Dytko v. Forest River, Inc.*, 2017 WL 5611613, *6 (D.N.M. Nov. 20, 2017); *Kraft v. Staten Island Boat Sales, Inc.*, 715 F.Supp.2d 464, 478 (S.D.N.Y. 2010); *Merricks, v. Monaco Coach Corp.*, 2008 WL 5210856, at **4-5 (W.D.Va. Dec. 15, 2008). Here, as in these other

cases, plaintiffs do not allege that they were denied a copy of the warranty after requesting it, or were refused an opportunity to review the written warranty before making the purchase. On the contrary, the evidence indicates that Myron made no effort to review the warranty before concluding the purchase on behalf of AF Funds, despite signing several documents representing that he had reviewed it.

Instead Myron says he relied on repeated representations that the RV was covered by a 1-year warranty. Plaintiffs repeatedly refer to Camping World and its personnel as agents of defendant Thor, attributing to Thor the representations of Camping World salesmen and other personnel concerning the length of the warranty. [*See, e.g.*, DE 34 at 13.] This is clearly contrary to the more than half a dozen statements expressly disclaiming any such relationship in the Limited Warranty, the Acknowledgement, and the Purchase Agreement that I reviewed earlier. *See supra*, pp. 5-6. "Under Indiana law, a person is presumed to understand and assent to the terms of the contracts he signs." *Guideone Ins. Co. v. U.S. Water Sys., Inc.*, 950 N.E.2d 1236, 1247 (Ind.Ct.App. 2011), quoted in *Jackson*, 711 F.3d at 793. Where a sophisticated business owner like Mr. Andersen signs such documents, I am not persuaded that he can disclaim their content by claiming that he relied on faulty information from sales agents.

In addition, the Seventh Circuit has observed that, "[a]s a general rule, a dealer is not an agent for manufacturers of the products it sells." *Carlisle v. Deere & Company*, 576 F.3d 649, 656 (7th Cir. 2009). *See also Hyundai Motor America, Inc. v. Goodin*, 804 N.E.2d 775, 787 (Ind.Ct.App. 2004) (reversed on other grounds, 822 N.E.2d 947 (Ind. 2005)) (a

routine car dealer/car manufacturer relationship does not make the dealer an agent of the manufacturer for purposes of the privity requirement); *Bushendorf v. Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir. 1993) (without more, a distributor who buys goods from a manufacturer for resale to the public is not the supplier's agent).

*Carlisle* was a breach of warranty case brought against Deere & Company concerning a semi-trailer-sized tree grinder equipped with a John Deere engine, and the court considered "whether West Side Tractor was an agent of Deere as required for its statement to be nonhearsay under Rule 801(d)(2)(D)." *Id*. Because the denial of an agency relationship is not dispositive under Indiana law, the court considered whether the general rule was overcome by a showing that "the principal manifests consent to the agency, the agent acquiesces, and the principal exerts control over the agent," noting that "[t]he principal's control over the purported agent's day-to-day operations is of paramount importance." *Id*.

The relevant operations are matters such as "personnel decisions, bookkeeping and financial matters, and buying and selling inventory and supplies." *Id*. There is no showing here of Thor exercising that kind of control over the operations of Camping World. To the contrary, the only evidence cited on the subject is the Rule 30(b)(6) deposition of Thor, in which Thor representative Mark Stanley testified generally that "[t]he dealer is an independent company, we don't regulate what they do." [DE 25-10 at 111.] On this record, I conclude that Camping World and its personnel did not act as agents of Thor in making statements to Myron concerning the RV's express warranty.

Plaintiffs argue that the warranty was *per se* unconscionable whether limited to 90 days or to 1 year, in effect contending that either period proved unreasonably short for such an expensive purchase that had so many defects and required such significant time undergoing repair. This court has several times rejected arguments that a one-year warranty on an RV is per se unconscionable. *Mathews*, 2018 WL 1586254, at *18; *Popham v. Keystone RV Co.*, 2016 WL 4993393, at *6-7 (N.D.Ind. Sept. 19, 2016). No authority is cited in support of plaintiffs' hindsight reasoning, which isn't shown to meet any test for unconscionability under Indiana law.

Based on this analysis, the Tuscan came with a 90-day express limited warranty and a 90-day implied warranty of merchantability. The 90-day period ran from January 28, 2016, when the RV was picked up from the Texas dealer, to April 27, 2016, in the middle of the RV's stay at Council Bluffs for service. Under Indiana law, a claim of breach of warranty has three elements: the existence of a warranty, breach of that warranty, and the breach as the proximate cause of the plaintiff's loss. *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind.Ct.App. 2009), citing *Frantz v. Cantrell*, 711 N.E.2d 856, 860 (Ind. Ct. App. 1999).

Thor quotes this court's Chief Judge Springmann: "When a breach of an express warranty occurs is a straightforward analysis: it must occur, if it is to occur at all, before the express warranty ends." *Popham v. Keystone RV Co.*, 2016 WL 4993393, at *5 (N.D.Ind. Sept. 19, 2016). Thor argues that the three problems not yet addressed at the end of the second set of repairs (during which the warranty period expired) were matters not covered by the warranty, and that all other complaints had been resolved.

[DE 25-1 at 11.]  The three issues are those identified in Myron Andersen's May 19 email to Mike Burden of Camping World Council Bluffs.  [Exh. A pp. 68-69; Exh. G.]  The radio console (which Thor treats as encompassing the functions of the Sirius radio service, GPS and DirecTV) and the cooktop were excluded from warranty coverage because they were subject to their own manufacturer's warranties.  Concerning the raccoon damage, Thor says that Andersen declined Burden's suggestion to file an insurance claim.  [DE 25-1 at 12.]  In opposition, plaintiffs argue that because the problems with the radio console and cooktop stemmed from their installation by Thor they are covered by Thor's warranty, and because the raccoon infestations occurred during a period of warranty repair, the resulting damage is also covered by Thor's warranty.  [DE 34 at 14-15.]

The "radio" and "stove" are components listed in the Warranty under "WHAT IS NOT COVERED" because they are "appliances and components covered by their own manufacturer's warranty."  [DE 25-7.]  The introductory paragraph of the warranty, under the caption "THIS LIMITED WARRANTY COVERS," limits coverage to "ONLY defects in workmanship performed and/or materials used to assemble those portions of your motorhome not excluded under the section 'What is Not Covered.'" This language effectively disclaims coverage not only for the radio console and cooktop themselves, but also for their faulty installation, because they are portions of the motorhome expressly excluded under "WHAT IS NOT COVERED."

Plaintiffs point to no language of the warranty that could conceivably provide coverage for the raccoon damage, but instead argue that "[s]uch a circumstance is not

specifically excluded from warranty coverage and certainly relates to shoddy workmanship." [DE 34 at 15.] Warranties are contracts, and provide benefits only as defined by their terms. So specific *inclusion* is what is required, not a failure to *exclude*. As for workmanship, the warranty's terms limit coverage to "those portions of a NEW motorhome not excluded under the section 'What is Not Covered'," and (as just discussed) "ONLY defects in workmanship performed and/or materials used to assemble those portions of your motorhome not excluded…." Raccoons are not "portions of" a motorhome. The nesting of raccoons during a bailment for repair does not constitute a defect in workmanship performed to assemble a covered portion of the motorhome, or at least, plaintiffs haven't offered evidence that would support such a conclusion.

The express warranty on this RV was obviously extremely narrow, both in its 90-day duration and in its scope of coverage, but, as Thor points out, it was not legally required to provide any warranty at all. On the record before me, I conclude that plaintiffs have not shown a dispute of material fact on the question of breach of the limited warranty, and as a matter of law conclude that Thor is entitled to summary judgment on the claim of breach of express warranty. Because the state law express warranty claims are defeated, so are the MMWA claims based on the same express warranty. *Mathews*, 2018 WL 1486254, at *20, citing *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001).

The next question is whether the implied warranty of merchantability claim survives summary judgment? Because Thor takes the position that its express warranty

succeeded in limiting both the duration and the scope of all implied warranties to mirror those of the express warranty, Thor offers no separate discussion of the implied warranty of merchantability in support of its motion for summary judgment, assuming that if the express limited warranty was not breached, no implied warranty was breached either. But the finding that Thor is entitled to summary judgment on the express warranty claim is premised on the conclusion that the issues remaining at the end of the warranty period were excluded from the scope of the express warranty's coverage. Since I also concluded that, given the constraints of the MMWA, Thor did not succeed in limiting implied warranties to the *scope* of the express warranty, the question remains whether the RV's unresolved issues constituted a breach of the implied warranty of merchantability. But as the movant, Thor has not offered an analysis of that question. So that claims survives summary judgment.

**State Deceptive Trade Practices Claim**

The "Third Claim" of the complaint alleges that Thor violated the Texas Deceptive Trade Practices-Consumer Protection Act "and/or" the Indiana Deceptive Consumer Sales Act. [DE 1 at 11.] The summary judgment briefing exposes the parties' disagreement about which state's consumer protection statute applies, with Thor advocating for Texas and the plaintiffs for Indiana. Paragraph 49 of the complaint enumerates 17 ways in which Thor allegedly violated the applicable consumer protection laws. [DE 1 at 12.] These consist of 17 legal conclusions and no supporting facts. Nor do any of the 17 subparagraphs cite by reference any facts earlier alleged in

the complaint, which itself largely consists of legal conclusions rather than assertions of fact.

One of Thor's challenges to this third count is that it is subject to, but has failed to meet, the pleading requirements of Fed.R.Civ.P. 9(b) for pleading allegations of fraud with particularity. [DE 25-1 at 23.] The argument draws my attention to a more fundamental defect of the pleading of the third claim, namely that it fails to meet the general pleading requirements of Fed.R.Civ.P. 8(a) as explained by the Supreme Court in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). But that ship has sailed, since Thor never challenged the pleading on that basis by a motion to dismiss under Rule 12(b)(6).

That brings us to the choice of law question. The parties agree that the choice of law rules of Indiana -- as the forum state -- apply. [DE 25-1 at 22; DE 34 at 24.] They further agree that because Indiana treats a consumer protection claim as a tort, Indiana applies the choice of law doctrine of *lex loci delicti* – the place of the wrong. [*Id.*] *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004). "Under this rule, the court applies the substantive laws of 'the state where the last event necessary to make an actor liable for the alleged wrong takes place.'" *Id.* (quoting *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987)). The parties agree that under Indiana law, that place is ordinarily where the loss occurred. [DE 25-1 at 23; DE 34 at 24.]

Because of the laundry list approach to pleading the third count, identifying the gravamen of the tort is challenging. Believing that the consumer protection claim sounds primarily in misrepresentation, Thor fixes the place of the wrong as Texas,

where the RV was purchased, allegedly in reliance on misrepresentations about the warranty. [DE 25-1 at 23.] Briefing this issue, plaintiffs focus their consumer protection claims on both breach of warranty and misrepresentation. [DE 34 at 25.] Plaintiffs of course acknowledge that the purchase occurred in Texas, but note that attempted warranty repairs occurred in Texas, Florida, Nebraska and Colorado. They then reason that because the "place of the tort bears little connection to the legal action" the court should consider other factors including the parties' residences or places of business and the place where the relationship is centered. [*Id*. at 25-26.] *Popham*, 2016 WL 4993393, at *11, citing *Simon*, 805 N.E.2d at 805-06. Plaintiffs urge the conclusion that Indiana law should govern because Indiana is both Thor's principal place of business and, as the locus of all warranty authorizations, the place where the parties' relationship is centered. [DE 34 at 26.]

Thor's reply to this argument is a bit disingenuous, citing a decision by Chief Judge Springmann to contend that plaintiffs' own argument favors Texas because "a breach of warranty occurs 'when tender of delivery is made.'" [DE 38 at 19, citing *Popham*, 2016 WL 4993393, at *4.] That passage from the *Popham* decision goes on: "except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered." *Id*., citing I.C. §26-1-2-725(2). Obviously, breaches of the warranty are alleged to have occurred in the various states where plaintiffs claim attempted repairs were insufficient or unsuccessful. In any event, for choice of law purposes, the places where warranty

repairs were attempted are too many and various, and are not urged by either party as the applicable source of state law.

But plaintiffs' choice of law argument for Indiana seems a bit strained. Although plaintiffs point to warranty authorizations by Thor from its Indiana headquarters, Thor rightly points out that "there has never been any allegation in this lawsuit that Thor's authorization process created any issues." [DE 38 at 20.] The initial consumer transaction, and the representations concerning the warranty on which plaintiffs say they relied, took place in Texas. Even the first warranty repairs are alleged by plaintiffs to have occurred in Texas before initial delivery of the Tuscany. [DE 34-1 at 2.] All things considered, I conclude that between the two states, Texas, rather than Indiana, is better characterized as the place where deceptive trade practices and the resulting loss occurred.

Thor argues that the Andersens are not "consumers" with a claim under the Texas Act because they did not "seek[] or acquire[] *by purchase or lease*, any goods or services." Tex. Bus. & Com. Code §17.45(4) (emphasis added). Plaintiffs, arguing only Indiana law, do not rebut this persuasive contention. In any event, the plaintiff LLC can maintain the claim as the "consumer" in the purchase of the RV.

For further analysis of the merits of the claim, plaintiffs narrow down the laundry list of their pleading and identify three kinds of deceptive acts their claim is based on. [DE 34 at 31.] The first is breach of the express warranty (or in turn the related violation of the MMWA). [*Id.*] The second is breach of an implied warranty (and the related violation of the MMWA). [*Id.*] The third is knowingly false representations

concerning the express warranty. [*Id.* at 31, 33.] Under the Texas Act, breach of an express or implied warranty that is a "producing cause of economic damages or damages for mental anguish" can support a claim. Tex. Bus. & Com. Code §17.50(a)(2). To the extent that the LLC's deceptive trade practices claim is based on breach of warranty, Thor argues that summary judgment is proper because the breach of warranty claims are themselves defeated by summary judgment. This is true for the express warranty claim, but not for the implied warranty of merchantability, for the reasons I have previously explained.

As to a deceptive practices claim premised on misrepresentations, Thor argues that Myron admitted in his deposition that Thor made no misrepresentations prior to the sale because he has acknowledged that there were no communications with Thor prior to the purchase. [DE 25-1 at 24.] Myron testified that "before purchasing the RV" he did not "call Thor and speak to anyone directly at Thor." [DE 25-3 at 33.] He also testified that he "relied upon the representations of the salesman" concerning the warranty on the RV. [*Id.* at 40; see also *id.* at 37-38.] Thor asserts, and I have earlier found, that Camping World was not Thor's agent. Thor further points out that the complaint does not allege that Thor misrepresented the existence and scope of the warranty. [DE 38 at 20-21.] The complaint alleges no facts about the length of the warranty, or that its length was misrepresented to Myron at the time of the purchase. Among the seventeen enumerated legal conclusions alleged in support of the "Udap law" violations are several that might encompass such a misrepresentation, but a specific representation about the length of the warranty is not alleged.

In opposition to summary judgment, the LLC unhelpfully argues only Indiana law.  The facts the LLC relies on involve communications to and by Camping World New Braunfels, not defendant Thor, at the time of the RV's purchase.  [DE 34 at 32.] The LLC also cites post-purchase interactions with Thor's authorized repair facilities or with Thor warranty representatives, and claims that in those, Thor "never told Plaintiffs that the RV was not covered under Defendant's warranty" even though Thor now takes the position the warranty expired after 90 days.  [DE 34 at 32.]   No evidence is cited in support of the assertion that "Defendant and its dealers kept telling Plaintiffs they had a one year TMC warranty."  [DE 34 at 33.]

Even assuming that there were such communications, and that they constitute a representation that the RV had characteristics or benefits that it did not have (a false practice under §17.46(b)(5) of the Texas Act),  how did the LLC rely on such post-purchase representations to its detriment, as required by §17.50(a)(1)(B)?  If Thor continued to authorize good will repairs outside the 90 day limited warranty, how was the LLC damaged thereby?   No DTPA claim based on misrepresentation is shown to be viable.  Both by failing to address the standards of the Texas law, and by failing to factually support an actionable deceptive trade practice, the LLC fails as a matter of law to demonstrate that it has a viable claim of violation of the Texas Act, except as might be supported by a breach of the implied warranty of merchantability, a claim that has not been specifically challenged by Thor's summary judgment motion.

Thor argues a "second, independent reason" for the failure of the statutory consumer protection claim, namely that it is barred by the economic loss doctrine.

Thor's brief treatment of this argument relies on this quote from the Texas Court of Appeals, applying the economic loss doctrine in a consumer protection context: "When the injury to the party raising the DTPA claim 'is only the economic loss to the subject of a contract itself, the action sounds in contract alone.'" *Hart v. Tufenkian Artisan Carpets*, 2019 WL 266831, at *5 (N.D.Tex. Jan. 18, 2019), quoting *Dewayne Rogers Loggings, Inc. v. Propac Industries, Ltd.*, 299 S.W.3d 374, 387 (Ct.App.Tex. 2009). The district court in *Hart* noted the Texas courts' difficulty applying this distinction. *Hart*, 2019 WL 266831, at *5. Although "[p]recedent makes clear that '[a]n allegation of mere breach of contract, without more, does not constitute a false, misleading, or deceptive act in violation of the DTPA,'" nonetheless courts "'have struggled to clarify the boundary between contract claims and other causes of action.'" *Id.*, quoting *Ashford Development, Inc. v. USLife Real Estate Services Co.*, 661 S.W.2d 933, 935 (Tex. 1983), and *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996).

In *Hart*, the court concluded that the plaintiff had alleged more than a breach of contract, noting "'where a plaintiff alleges that the defendant represented that he or she would provide a certain good or service and the defendant then fails to provide that good or service, the plaintiff successfully alleges more than a mere breach of contract claim.'" *Hart*, 2019 WL 266831, at *5, quoting *Collections Fine Jewelry, Inc. v. Stanley Convergent Security Solutions, Inc.*, 2012 WL 12884572, at *3 (N.D.Tex. Aug. 29, 2012). Thor analogizes to a misrepresentation-based claim and contends that in this case "the Plaintiffs' damages are purely economic and relate solely to the subject of the consumer transaction at issue, namely, the RV," and "not any separate harm from an alleged

misrepresentation." [DE 25-1 at 25.] I have already concluded that the misrepresentation-based TDCPA claim is subject to summary judgment, but it's unclear how the economic loss doctrine could possibly bar DTPA claims based on misrepresentations of the several kinds specifically enumerated in §17.46(b)(5) and (7). Again with this secondary argument, Thor overlooks the breach of warranty basis for a DTPA claim, and since §17.50(a)(2) of the Act also expressly authorizes claims based on "breach of an express or implied warranty," I am not persuaded Thor's theory could defeat such a claim as a matter of law.

**Motion to Strike Portions of the Affidavit of Myron Andersen**

Thor moves to strike portions of Myron's affidavit that was submitted in opposition to the motion for summary judgment. [DE 39.] Thor argues that some of the affidavit's contents contradict Myron's prior sworn deposition testimony, that some constitute inadmissible hearsay, and that some express legal conclusions. Although there is some merit to these contentions, the motion will be denied without prejudice as moot because my analysis of the summary judgment motion doesn't rely on any of the challenged statements in the affidavit.

**ACCORDINGLY:**

Defendant Thor Motor Coach's Motion for Summary Judgment [DE 25] is DENIED IN PART as to plaintiff AF Funds LLC's claims that Thor breached the implied

warranty of merchantability under state law and the Magnuson-Moss Warranty Act, and that such a breach constituted a violation of the Texas Deceptive Trade Practices Act. In all other respects, the motion is granted, including as to all claims by plaintiffs Myron Andersen and Ruth Andersen.

Defendant Thor Motor Coach's Motion to Strike Portions of the Affidavit of Myron Andersen [DE 39] is DENIED WITHOUT PREJUDICE AS MOOT.

**SO ORDERED on July 11, 2019.**

**/s/ Philip P. Simon**
**JUDGE**
**UNITED STATES DISTRICT COURT**